1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| J. KATHLEEN HUGE,<br><br>    Plaintiff,<br>  v.<br><br>THE BOEING COMPANY, a Delaware<br>Corporation,<br><br>    Defendant. | Case No. C14-857 RSM<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW AND ORDER |

## I.  INTRODUCTION

  A bench trial was held in this matter from December 14, 2015 to December 18, 2015, with live testimony and exhibits submitted by both parties. Closing arguments were heard on February 26, 2016, after the parties prepared proposed Findings of Fact and Conclusions of Law, Dkt. ##82, 83, and Stipulated Findings of Fact, Dkt. #81.

  The issues of law are: 1) whether Ms. Huge introduced sufficient evidence to support her claim that Boeing violated the Americans with Disabilities Act ("ADA") or Washington Law Against Discrimination ("WLAD") by intentionally discriminating against her on the basis of her disability or failing to provide a reasonable accommodation when Boeing placed Plaintiff on unpaid medical leave in June 2012, or withdrew the job offer for the Long Beach, California position, or terminated Plaintiff's employment in January 2013; 2) whether Ms. Huge introduced sufficient evidence to support her claim that Boeing intentionally retaliated against her by placing her on unpaid medical leave in June 2012 or by terminating her

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

employment in January 2013; 3) whether Ms. Huge introduced sufficient evidence on damages, and 4) whether any party is entitled to attorneys' fees and costs.  Dkt. #68 at 9-10.

## II.   STIPULATED FINDINGS OF FACT

The parties stipulate to the following findings of fact, and the Court adopts them.  *See* Dkt. #81.

1. Plaintiff J. Kathleen Huge has received training as an industrial engineer.

2. The Boeing Company employs more than 500 people in the Puget Sound region.

3. Ms. Huge has been diagnosed with Autism. Huge was diagnosed with Asperger's Syndrome, which is now considered to be part of Autism spectrum disorder by the American Psychiatric Association's Diagnosis and Statistical Manual of Mental Disorders.

4. Ms. Huge was first employed by the Boeing Company on April 28, 2006 in Everett, Washington.

5. Ms. Huge commenced a medical leave on February 9, 2007.

6. In July 2007, Ms. Huge underwent a "fitness for duty" exam with Laura Brown, Ph.D.

7. Ms. Huge was medically laid off from her employment with Boeing on March 28, 2008.

8. In August 2009, Ms. Huge was hired as an industrial engineer by Global Aeronautica in Charleston, South Carolina.

9. Global Aeronautica was acquired by Boeing in 2010, and as a result, Ms. Huge again became a Boeing employee in the position of Industrial Engineer 2 on June 18, 2010.

10. In late 2010, Ms. Huge applied for and was offered an industrial engineer position in Renton, Washington.

11. Ms. Huge started working in the position of Industrial Engineer 3 in Renton on March 11, 2011 in the RFID group.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 2

12. On May 4, 2012, Ms. Huge was advised that she needed to undergo a "coaching session" with her manager, Benjie Gualco, to discuss her work performance.

13. After being notified of the coaching session, Ms. Huge complained that she was being harassed by her lead, Chic Sundahl, because of her disability.

14. On approximately May 21, 2012, Boeing moved Ms. Huge's work group from RFID to Metrics.

15. Ms. Huge remained an Industrial Engineer 3 and her compensation and benefits remained the same.

16. On May 23, 2012, Huge emailed Nancy Steig, who was temporarily covering for Ms. Huge's manager Benjie Gualco, stating "I need instructions in writing. This helps me to understand what is being asked. It also shows what I was asked to do, so if plans change, then at least I have a record of what I was asked to do."

17. Ms. Huge was issued a Documented Verbal Warning on or about May 24, 2012.

18. When Ms. Huge was given the verbal warning, she requested that her job instructions be given to her verbally and in writing. She was told she had no medical restrictions on file and should see Boeing Medical if she needed an accommodation.

19. Ms. Huge was issued a 30-day Performance Improvement Plan on approximately May 29, 2012.

20. On June 11, 2012, Mary Dowell sent Ms. Huge a notice to attend a meeting on June 12, 2012, with Ms. Dowell, Mr. Gualco, HR and Plaintiff's Union Representative.

21. On June 12, 2012, Ms. Huge met with Dr. Judith Molin in Boeing Medical and provided her with a letter from Dr. James Kaplar, Ph.D. stating Huge should be

accorded accommodations to perform her job, including that she "be given her assignments and tasks in written form or electronic form."

22. On June 12, 2012, Boeing Medical issued the medical restriction "For all tasks/assignments: Give instructions verbally and written or electronic form."

23. On June 13, 2012, Boeing Accommodation Services met with Ms. Huge, her Union Representative, and HR regarding her requested accommodations.

24. Boeing placed Ms. Huge on an involuntary medical leave of absence effective June 14, 2012.

25. On June 19, 2012, Ms. Huge was sent a letter from Dr. Molin at Boeing Medical requesting Huge to provide a letter from a current treating physician or psychologist that would identify Plaintiff's diagnosis, any requested accommodations or medical restrictions for Huge, and identifying whether the requested accommodations were temporary or permanent.

26. Ms. Huge provided a letter from Dr. Crystal Kong-Wong on July 2, 2012, that stated she saw Huge in her clinic on 6/18/12 and "can confirm her diagnosis of Asperger's Syndrome (High functioning Autism)," that she was referring Huge to vocational counseling, and that she had reviewed a letter written by Dr. Kaplar and that Huge may also benefit from a job coach.

27. After Dr. Molin spoke with Dr. Kong-Wong, Boeing requested that Ms. Huge receive an independent mental health evaluation.

28. On July 11, 2012, Dr. Molin sent a job analysis and cognitive job analysis for Ms. Huge's position to Dr. Laura Brown requesting that she conduct an independent mental health evaluation of Huge.

29. Ms. Huge was scheduled to be evaluated by Dr. Brown on July 25, 2012.

30. On July 19, 2012, Ms. Huge submitted a letter from Dr. Robert Fraser, Ph.D. a rehabilitation psychologist at Harborview Medical Center stating "Ms. Huge would benefit from a job coach or mentor during the first 15-20 minutes of the work day in order to ensure that she has received her instructional sequence of tasks for the day completely and in correct order. Another option would be that Ms. Huge be provided with a complete task list by her supervisor, either written or by e-mail, each morning during this period of adaptation. Ms. Huge should be given time to learn her new statement of work and/or new systems. Care should also be given during this period of time to fully explain any mistakes she made while she is learning the new position. It could be helpful for her supervisor(s) and perhaps co-workers to benefit from an educational session on Asperger's and effective communication with a person having the syndrome." The letter also stated "Other accommodation avenues could also be explored."

31. Ms. Huge was evaluated by Dr. Gary Stobbe, M.D. and Dr. Julie Davies, Ph.D., in September and October 2012.

32. While Ms. Huge was on the medical leave of absence, she applied for other positions within Boeing and was offered an industrial engineering position in Macon, GA and a manufacturing engineering position in Long Beach, CA.

33. Ms. Huge accepted the Long Beach, CA manufacturing engineering position on September 7, 2012, which had a tentative start date of October 5, 2012.

34. On October 8, 2012, Manager Dung Tran, who interviewed Ms. Huge on August 28, 2012, contacted Boeing Staffing and requested to withdraw the offer due to the need to fill the position.

35. On October 9, 2012, Ms. Huge was advised that the Long Beach job offer would be withdrawn.

36. Boeing offered the Long Beach position to Miguel Pascual on October 13, 2012.

37. On October 16, 2012, Boeing received the medical evaluation from Dr. Stobbe and Dr. Davies and Dr. Molin called Dr. Davies to discuss her questions regarding the recommendation of a job coach and was told she could expect additional information from Dr. Stobbe on October 18, 2012. On October 18, 2012, Dr. Molin emailed Dr. Stobbe and he called her back on October 19, 2012, and recommended a job coach for two hours per day for one month to start and said he was hopeful Deb Bloom, Ms. Huge's counselor, could act as job coach even though she was not a job coach, and that he and Dr. Davies would get back to Dr. Molin regarding whether Ms. Bloom was available to serve as job coach.

38. On or about October 23, 2012, Miguel Pascual accepted the Long Beach position.

39. Pascual started work at Boeing's Long Beach facility on November 7, 2012.

40. On October 24, 2012, Dr. Stobbe emailed Dr. Molin that Ms. Bloom was available but Ms. Huge now was requesting DVR to provide the job coach and he had encouraged Huge to speak further with Ms. Bloom and her attorney.

41. On October 30, 2012, Boeing learned that Ms. Bloom would act as a job coach and Boeing Accommodation Services Representative Shaun Holdaas requested a badge for

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 6

the job coach to secure entry into Boeing locations with a potential start date of November 5, 2012.

42. On November 5, 2012, Mr. Holdaas met with Ms. Bloom regarding Huge potentially returning to work on November 6, 2012.

43. Ms. Bloom required that a contract be signed by Boeing with an indemnification provision before she began any work as a job coach.

44. On November 5, 2012, Mr. Holdaas informed Ms. Huge that a job coach would not be available November 6 or 7 due to the contract review and gave her the option to return to work without a job coach on November 6 and 7, before the vacation requested by Huge from November 8 to 12, 2012, or return to work November 13, 2012, and Huge chose to return November 13, 2012.

45. On October 25, 2012, Mr. Holdaas began to explore alternative job coaches through the Department of Vocational Rehabilitation Services.

46. Ms. Bloom and Boeing did not agree on a contract so Mr. Holdaas worked with DVR to obtain job coaches through ENSO.

47. On November 16, 2012, Boeing met with ENSO regarding providing the job coach services and then waited for ENSO to provide a start date and action plan for the job coaches.

48. Ms. Huge returned to work on December 21, 2012, so she would receive benefits and holiday pay, but the job coaches did not start until January 2013.

49. Ms. Huge filed a disability discrimination charge with the EEOC on December 20, 2012.

50. Ms. Huge was provided a job coach, Jamie Carter (now Eang) of ENSO, on January 7, 2013. The job coach was jointly paid for by the Washington Department of Vocational Rehabilitation and Boeing.

51. After Ms. Huge returned to work, she was issued the "Notice of Remedial Action" or "NORA" planned in June 2012, a written warning planned in June 2012, and her performance evaluation for 2012.

52. Jamie Carter sent Ms. Huge an email entitled "Action Items for Kathleen" on January 8, 2013.

53. On January 16, 2013, Ms. Huge met with ENSO and DVR. Huge informed ENSO that she did not want Jamie Carter as her job coach.

54. On January 17, 2013, Ms. Huge was placed on leave.

55. On January 21, 2013, Ms. Huge's employment was terminated.

56. Ms. Huge earned $100,668 from Boeing in 2011.

57. Ms. Huge earned $53,878 from Boeing in 2012.

58. Ms. Huge earned $10,869 from Boeing in 2013.

59. Boeing contributed $662.53 per month for Ms. Huge's insurance in 2013.

60. Ms. Huge earned $38,967.31 from Northrop Grumman in 2013.

61. Ms. Huge earned $80,617.30 from Northrop Grumman in 2014.

## III.  CREDIBILITY OF THE WITNESSES

"In an action tried on the facts without a jury... the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). The trial court is empowered to judge the credibility of the witnesses. *See Spokane Arcade, Inc. v. City of*

*Spokane*, 75 F.3d 663, 665 (9th Cir. 1996); *Zivkovic v. S. Cal. Edison Co.*, 105 Fed. Appx. 892, 893 at n.1 (9th Cir. 2004) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985)).

The Court heard from many of the above named individuals as witnesses in the bench trial. The Court finds that supervisors Benjie Gualco and Dan McQueen, coworker Diem Huynh, job coach Jamie Eang née Carter, Boeing Accommodation Services Representative Sean Holdaas, and Long Beach Manager Dung Tran were credible. Their answers during testimony were complete and appeared to be honest, and their demeanor on the witness stand leads the Court to conclude that they were truthful. To the extent that Ms. Huge's testimony differed from her supervisors, coworkers, and job coaches, and from admitted evidence, she was not credible. Ms. Huge's answers during testimony appeared calculated to support her legal position rather than an honest recitation of events, and her demeanor on the witness stand leads the Court to conclude that she was repeatedly searching to state only those facts that support her position, and omitting or neglecting those facts that harmed her position. Furthermore, the findings of fact below indicate that Ms. Huge has repeatedly submitted demonstrably inaccurate statements to Boeing and other employers in her job search.

## IV.    ADDITIONAL FINDINGS OF FACT

The following additional findings of fact are made by the Court and based upon a preponderance of the evidence presented at trial and the above credibility analysis.

1.  According to expert testimony, high functioning autism and Asperger's syndrome have the characteristics of social communication difficulties, cognitive inflexibility, and difficulty with perspective taking. Dkt. #75 at 47:6-10. These deficits in social interaction often include difficulty with emotional reciprocity in conversations,

difficulties in nonverbal communication and perceiving nonverbal behaviors, and difficulty adjusting behavior to suit different social contexts and venues. Dkt. #76 at 8:3-15.  Anxiety is very common for individuals on the autism spectrum.  Dkt. #75, 47:11-16; Dkt. #77, 7:2-15.  Individuals on the autism spectrum frequently experience difficulty navigating the world.  They often see "black-and-white" where nuance might be perceived by others; they often struggle with the cognitive flexibility that is needed to navigate social interactions. Dkt. #75, 48:2-21.

2.  On May 21, 2012, Ms. Huge transitioned into a new group, Metrics, which required less customer interaction than her previous position.  Dkt. #79 at 83:25-84:21.  Mr. Gualco and other employees invested a substantial amount of time and effort to help Ms. Huge succeed in the Metrics group.  They provided her with standard work instructions which contained step-by-step instructions for completing her tasks and they had Ms. Huge sit with her team leader and other coworkers for training.  Dkt. #77 at 147:9-11; Dkt. #79 at 87:23-93:9;  Ex. A-371.   Ms. Huge continued to not meet the performance expectations of an IE 3.  *Id*.; Dkt. #78 at 185:3-194:4; Exs. A-72, A-166, A-182.

3.  During this time period, Ms. Huge talked about personal issues to her coworkers frequently, and her coworkers complained to Ms. Huge's manager that she was distracting them to the point that they had to leave the area to get work done.  *See* Exs. A-77, A-98, A-191; Dkt. #78 at 192:11-20.  Ms. Huge's supervisors also were concerned about a number of unprofessional email communications sent by Ms. Huge. Dkt. #78 at 192:25-193:8.  For example, Ms. Huge emailed her union representative and copied Nancy Steig, claiming she was not able to take her lunch due to Ms. Steig's request, which misrepresented Ms. Steig's request, Ex. A-250, and Ms. Huge emailed

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 10

someone outside the group stating Suzy Burdge and Ms. Steig would not let her attend a meeting, after she had told Ms. Burdge she understood she needed to stay and work on a metrics assignment due to a deadline.  Ex. A-187.

4.  Ms. Huge's managers attempted to give Ms. Huge both verbal and written instructions even though Ms. Huge failed to go to Boeing Medical to request any accommodation for a disability.  Ex. A-77 at 2; Dkt. #75 at 194:4-11, 204:6-16.

5.  Throughout May and June 2012, Mr. Gualco and Ms. Huge's new team leader, Diem Huynh, observed that Ms. Huge continued to underperform and that she failed to complete the tasks outlined in her 30-day performance improvement plan.  *See generally* Dkt. #78 at 214:2-225:8; Exs. A-35, A-38, A-195.  They also observed that Ms. Huge appeared to lack basic engineering skills and required guidance and step-by-step instructions for basic tasks and analyses that an IE 3 should perform independently. *Id.*  Ms. Huynh, consistent with Matt Stewart, Fraser Whigham, Carl Hassenmeyer, also observed that Ms. Huge's engineering skills appeared to be those of an IE 1.  Dkt. #78 at 224:20-23.

6.  On June 5, 2012, Ms. Huge's first and second-level managers and representatives from Boeing HR, Employee Relations, and EAP met to discuss Ms. Huge's poor work performance and decided to give her a Notice of Remedial Action ("NORA"), which expressly documented Boeing's expectations for Ms. Huge's performance, due to her lack of progress under the PIP.  Ex. A-28.

7.  On June 6, 2012, Mr. Gualco and Ms. Huynh met with Ms. Huge and coached her about being disruptive in the workplace and limiting her personal calls to non-work hours.

Ex. A-77 at 2; *see also* Ex. A-169.  Ms. Huge also was told that she was not completing her assigned tasks.  *Id*.

8.  On June 12, 2012, Ms. Huge met with Boeing Medical's Dr. Judith Molin and stated she was on a PIP and needed to receive her work instructions in writing.  Ms. Huge gave Dr. Molin a letter dated June 11, 2012, from Ohio doctor James Kaplar, Ph.D., stating that Ms. Huge had autism or Asperger's syndrome and that she required accommodations to do her job.  Dr. Kaplar's letter stated that "it would be helpful for Ms. Huge to be given her assignments and tasks in written form or electronic form (e.g., via e-mail) as well."  Ex. A-321 at 6-7.

9.  Boeing Medical does not have any medical provider on staff who has significant experience in psychological or psychiatric mental health issues.  Dkt. #79 at 139:1-8, 139:18-22.

10.  Dr. Molin discussed with Ms. Huge her requested accommodation of receiving work instructions in writing.  Ex. A-321 at 5.  Based on this discussion and the letter from Dr. Kaplar, Boeing Medical issued medical restrictions stating that Ms. Huge should be given all tasks and assignments both verbally and in written or electronic form.  *Id*; Dkt. #76 at 49:22-50-11.

11.  On June 13, 2012, Ms. Dowell, Mr. Gualco, a Disability Management Representative, an Accommodation Services Representative, and HR discussed whether Ms. Huge's medical restrictions could be accommodated.  Ex. A-46 at 13-14.  Mr. Gualco reported that he already was providing Ms. Huge with written tasks, extra time and coaching, and that the significant level of detail and follow up that Ms. Huge had been requesting

in writing was not sustainable and required so much time that it was impacting productivity in the management and lead positions.  *Id.*; Dkt. #79 at 89:25-92:15.

12. Assisting Ms. Huge consumed at least 80% of Mr. Gualco's work day and over 50% of Ms. Huge's team leader's day.  Dkt. #79 at 89:25-92:15, 95:19-96:3, 107:6-18.  Given the complexity of Ms. Huge's work, the fast operating speed of business requirements in the work group could not be met with such a significant amount of time being spent detailing all of Ms. Huge's work tasks and assignments to her satisfaction.  *Id.*

13. On June 14, 2012, Boeing Medical placed Ms. Huge on a medical leave of absence until Boeing could clarify what reasonable accommodations Ms. Huge needed and whether Ms. Huge could successfully perform the essential functions of her job with or without reasonable accommodations.  *Id.*

14. On June 14, 2012, Ms. Huge attempted to return to Boeing Medical and see Dr. Molin.  Ex. A-321 at 8.  Because Dr. Molin was still waiting for information from Ms. Huge's healthcare providers and because Ms. Huge had caused disruptions in the Boeing Medical clinic, Dr. Molin did not meet with her that day.  *Id.*; *see also* Dkt. #79 at 125:8-126:8.  Ms. Huge responded by calling the clinic at least five times and threatening to call the medical board and "to have Dr. Molin's license pulled." Ex. A-321 at 8.

15. On June 14, 2012, Shaun Holdaas spoke with Ms. Huge about her medical leave and accommodation.  Ms. Huge told Mr. Holdaas that she had actually requested everything in writing because she wanted to document all conversations and tasks to ensure that they could not be used against her.  Dkt. #79 at 150:20-22; Ex. A-46 at 12.  Mr. Holdaas recalls Ms. Huge stated: "I can't believe you guys are so stupid. I put that medical

restriction in there so that they couldn't use anything against me."  Dkt. #79 at 150:20-22.

16. On June 18, 2012, Dr. Molin called Dr. Kaplar for clarification of Ms. Huge's medical needs, but he was not available so Dr. Molin left a message with his answering service. That same day, Ms. Huge emailed Dr. Molin requesting an interpreter, translator, or transcriber to write down all of her tasks and assignments. Ex. A-321 at 12, 31-32; *see also* Ex. A-80.

17. On June 21, 2012, Dr. Molin left another message for Dr. Kaplar, who never responded, and contacted independent mental health examiner Dr. Laura Brown about evaluating Ms. Huge, but Dr. Brown was out of the office until July 3, 2012. Ex. A-321 at 17.

18. In June 2012, Ms. Huge saw a general practitioner twice, Dr. Crystal Kong-Wong, who faxed Boeing Medical a completed functional capacity evaluation ("FCE") on June 26, 2012. Ex. A-321 at 20-21.  Dr. Molin called Dr. Wong who explained that Ms. Huge did not have any physical restrictions under the FCE, but that Dr. Wong was not trained to diagnose Ms. Huge's mental health disorder or determine cognitive restrictions. *Id*. Dr. Wong suggested that Ms. Huge required an evaluation by a Ph.D. who specialized in autism or Asperger's. *Id*.  Dr. Wong followed up her recommendations by letter on June 28, 2012, and referred Ms. Huge to vocational expert, Joe Stuckey, for cognitive evaluation and recommendations. Ex. 86.  Based on Dr. Wong's statement that she was not capable of evaluating Ms. Huge's cognitive abilities and could only suggest physical, not cognitive accommodations, and Dr. Wong's agreement that Ms. Huge's medical restrictions should not be changed until Ms. Huge could be evaluated by an

autism expert, Dr. Molin did not change Ms. Huge's medical restrictions, pending input from a cognitive evaluation.  Ex. A-321 at 24; Dkt. #79 at 117:3-14.

19. Boeing requested that Ms. Huge receive an independent mental health evaluation by a qualified doctor, and in early July 2012, referred Ms. Huge to Dr. Laura Brown, Ph.D. Ex. 91. On July 9, 2012, Dr. Molin noted that the exam was particularly necessary for her to reconcile Dr. Waid's February 2011 letter stating that Ms. Huge needed no accommodation or restrictions, with Ms. Huge's requests for a translator, job coach, and written instructions. Ex. A-321 at 32.

20. In July 2012, Ms. Huge was seen twice by vocational specialist Dr. Robert Fraser, Ph.D., after which he recommended in a letter Dr. Molin received on July 20, 2012, that Ms. Huge receive a number of accommodations, including a job coach, a written task list, and extra time to learn new tasks.  Dkt. #76 at 19:11-20:13; Ex. 89.  Dr. Fraser does not specialize in autism and did not give Ms. Huge any psychological testing.  Dkt. #76 at 19:5-10, 21:8-10.   Dr. Fraser did not review any psychological or performance evaluations for Ms. Huge, and relied only on a letter from Dr. Kapler and work emails that Ms. Huge provided him.  Dkt. #76 at 21:11-22:25.  When Dr. Fraser wrote that Ms. Huge should receive a written task list, he meant "major tasks," not step-by-step instructions.  Dkt. #76 at 23:8-13. Dr. Fraser also believed that Ms. Huge required a job coach for only 15-20 minutes per day for a period of time.  Dkt. #76 at 23:14-22.

21. On July 9, 2012, Ms. Huge wrote in an email to Dr. Fraser "The ONLY reason as to why I requested assignments in writing was so that I can hold them to what they wanted me to do and that it would be very difficult to say, 'I never said that', because I will

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 15

have the assignment in writing.  It would serve as 'PROOF' and 'EVIDENCE'."  Ex. A-393 (emphasis in original).

22. On July 12, 2012, Dr. Brown told Boeing Medical that Ms. Huge had scheduled her exam for July 25, 2012, to accommodate Ms. Huge's vacation in the middle of July. Ex. A-321 at 38.  Once the exam was scheduled, Ms. Huge sent Mr. Holdaas and Dr. Brown numerous emails asking about the tests Dr. Brown would use as part of the evaluation, and she told them that she would be studying for the tests.  Exs. A-321 at 39-43, A-312.  Ms. Huge sent multiple emails threatening to walk out and cancel the tests if she was not told the names of the tests in advance so that she could have time to prepare and "beat" the tests.  *Id*.  Dr. Brown then called Dr. Molin stating that Ms. Huge was escalating and that Ms. Huge threatened to sue Dr. Brown for not giving her information about the psychological tests in advance so that she could "beat" the tests and "tweak her responses."  *Id*.

23. On July 13, 2012, Ms. Huge made more requests, asking to record her session with Dr. Brown and for a guardian or personal assistant to accompany her.  *Id*.  On July 16, Ms. Huge requested extra time to take the psychological tests.  *Id*.  Dr. Brown explained to Ms. Huge that the tests were standardized and had to be timed to produce accurate results, but allowed Ms. Huge to record the exam.  *Id*.  On July 20, 2012, Ms. Huge sent Dr. Brown more emails requesting the names and details of the tests.  Dr. Brown again explained to Ms. Huge that preparing for the tests was not necessary or appropriate.  *Id*.

24. On July 23, 2012, Ms. Huge emailed Dr. Brown stating that she was sick and was going to be sick for the next two days as well and asked to reschedule the July 25 exam for

July 26.  Exs. A-312 at 11, A-321 at 51.  Five hours later, Ms. Huge canceled the July

26 exam and rescheduled the test for July 30.  Ex. A-312 at 13.

25. On July 25, 2012, the day Ms. Huge had been scheduled for evaluation by Dr. Brown

but canceled saying she was sick, Ms. Huge visited marriage and family counselor

Deborah Bloom.  Dkt. #75 at 68:6-14, 69:18-24.  Ms. Huge told Ms. Bloom that she

wanted to find a copy of the questions she would be asked on the tests, but Ms. Bloom

told her that would be unethical and there was no way to train for the tests.  Dkt. #75 at

78:2-15.

26. On July 25, 2012, Ms. Huge emailed Dr. Brown and stated "My attorney has 7 other

clients who hired him because you have given recommendations to Boeing that makes

(sic) it impossible to accommodate them.  They are now unemployed, and collecting

unemployment, and SSI.  They are living off of your taxes."  Ex. A-312 at 30.  Dr.

Brown responded "Kathleen, this is becoming unproductive.  I am going to propose that

you stop emailing me and that you simply participate in the evaluation process."  *Id.* at

31.

27. On July 26, 2012, Ms. Huge emailed Dr. Brown with more requested accommodations

and gave her permission to contact a coworker at Boeing in Charleston.  Ex. A-213 at

32.  Around this time, Ms. Huge's attorney, Matt Bean, contacted Dr. Brown and she

felt he was attempting to influence the outcome of the exam.  Ex. A-321 at 51, 54.  Dr.

Brown refused Mr. Bean's request to make certain findings and on July 30, 2012, Dr.

Brown told Boeing she would not go forward with the evaluation under the

circumstances.  *Id.*; See Ex. A-56.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 17

28. After Dr. Brown decided not to evaluate Ms. Huge, Dr. Molin immediately began looking for a new evaluator. Dr. Molin called Psychiatrist David White, M.D. on July 30, 2012, but he declined the case. The same day she tried Psychiatrist Steven Becker, M.D. and left a message with his receptionist. Ex. A-321 at 54.

29. While Dr. Molin attempted to find a new evaluator, Dr. Fraser contacted Boeing on August 6, 2012, now stating that Ms. Huge no longer needed instructions in writing, in contradiction with his earlier evaluation. Ex. A-321 at 59. Given this about face, Dr. Molin called Dr. Fraser, who admitted that he wrote the letter at Ms. Huge's request based on her statement that she no longer needed instructions in writing because she would be receiving written tasks through a performance plan. Ex. A-321 at 56-58; Dkt. #76 at 24:1-5.

30. Based on Ms. Huge's changing accommodation requests, Dr. Molin felt an independent psychological evaluation was necessary to determine Ms. Huge's accommodation needs and reconcile the conflicting information received from Ms. Huge and her numerous doctors. Dkt. #76 at 48:16-24. *See also* Exs. 84, 95. Ms. Huge and her attorney agreed to cooperate with a psychological examination. Ex. 95.

31. On August 14, 2012, Ms. Huge submitted a letter from Ms. Bloom requesting a job coach as a permanent accommodation. Ex. A-321 at 69. At the time, Ms. Bloom believed that Ms. Huge should undergo a new psychological evaluation and communicated that to Ms. Huge's attorney. Dkt. #75 at 71:19-72:9. Ms. Bloom suggested that Dr. Stobbe conduct the evaluation. *Id.* at 79:9-24.

32. On September 21, Boeing Medical received a second letter from Ms. Bloom stating that she had reviewed a September 6, 2012, evaluation from Dr. Stobbe and was now

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 18

changing her recommendation to say that a job coach was not needed if Ms. Huge was transferred to a different Boeing position or location. Ex. A-321 at 70. This change, like many of the other changes that Ms. Huge's doctors had made, was made at Ms. Huge's request and after Ms. Huge's attorney approved the letter. Dkt. #75 at 82:13-84:3.

33. While Ms. Huge was on medical leave and Boeing was requesting information regarding her ability to perform her job and needed accommodations, Ms. Huge had applied for a Manufacturing Engineer job at Boeing's Long Beach, California facility. The Manufacturing Engineering job required extensive customer interaction, approximately 20-30 customer phone calls per day, and fast responses to customer questions. Dkt. #79 at 36:2-38:21.

34. Long Beach Manager Dung Tran interviewed Ms. Huge over the phone, and on August 28, 2012, offered her the job with an October 5, 2012, start date. Ms. Huge, however, was not cleared to return to work as an engineer when she was scheduled to report to work. Dkt. #79 at 38:22-39:8, 40:23-41:11.

35. By October 8, 2012, because Ms. Huge had not reported to work by the start date, Mr. Tran contacted Boeing Staffing and requested to withdraw Ms. Huge's offer due to his group's immediate need to fill the empty position to address a massive backlog and threats from his customers to cancel their orders. Dkt. #79 at 39:19-42:23. Mr. Tran had no knowledge of Ms. Huge's disability or that she was on medical leave. *See id.* Mr. Tran did not believe that he could wait for Ms. Huge to become available to fill the position in his organization. *Id.* at 46:16-47:19.

36. Ms. Huge's IE 3 position in Renton continued to be held for her, but locating a job coach who was available every day for 30 days, as Dr. Stobbe indicated Ms. Huge needed, was difficult. *See* Ex. A-321 at 120; Ex. 380. On October 24, 2012, Dr. Stobbe emailed Dr. Molin to tell her that Ms. Bloom was available to act as Ms. Huge's job coach, but not during the time slot that Ms. Huge preferred, and that Ms. Huge was insisting on using a job coach from the Washington Department of Vocational Rehabilitation ("DVR") who would be available first thing in the morning. Ex. A-321 at 111-113; *see* Ex. 380. Dr. Stobbe recommended that Ms. Huge speak with her attorney and Ms. Bloom. *Id*. On October 30, 2012, Ms. Bloom agreed to act as Ms. Huge's job coach and she was scheduled to meet with Ms. Huge's managers at Boeing on November 5, so that Ms. Huge could return to work on November 6. Ex. A-321 at 114, 118.

37. Ms. Bloom would not agree to provide the job coach services unless indemnification provisions were added to protect her from being sued, which delayed Ms. Huge's return date. Ex. 179. Ms. Bloom was adamant that no work could begin until her contract was signed by a Boeing representative. Ex. A-46 at 3.

38. While Boeing tried to resolve Ms. Bloom's indemnification request, Boeing gave Ms. Huge the option to work without a job coach for November 6 and 7, 2012, and take her requested vacation from November 8 to 12, 2012, but Ms. Huge chose to delay her start date until November 13, 2012. Exs. A-46 at 3, A-293 at 55.

39. Ms. Bloom met with Ms. Huge's managers and took steps to act as Ms. Huge's job coach, but ultimately informed Boeing that she would not agree to work as Ms. Huge's job coach. Dkt. #75 at 92:11-94:11.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 20

40. Due to the delay caused by Ms. Bloom dropping out as job coach, Mr. Holdaas emailed DVR, requesting potential job coach services. Ex. A-380. Boeing then began communicating with Stephanie Nuce of ENSO Employment Services, who was identified by DVR for job coach services. Exs. A-46 at 2, A-321 at 120, A-380 at 61. On November 16, 2012, Ms. Huge's managers and Mr. Holdaas met with ENSO to discuss Ms. Huge's situation, the job that Ms. Huge would be performing upon her return, and the job coach's role in helping Ms. Huge return to work. Ex. A-46 at 2. Boeing and DVR ultimately arranged for Jamie Carter (who later changed her name to Jamie Eang) and Stephanie Nuce of ENSO to serve as Ms. Huge's job coaches. Ex. A-46 at 1.

41. Mr. Holdaas assisted Ms. Huge throughout the accommodation process by talking and emailing with Ms. Huge on a frequent basis, communicating extensively with Dr. Molin, communicating with Ms. Huge's managers, researching potential accommodations with the Job Accommodation Network, researching and sourcing potential job coaches, working with DVR and ENSO, and meeting and corresponding with the job coaches. Dkt. #76 at 83:24-25; Dkt. #79 at 143:23-146:8, 147:22-150:1; Ex. A-46. He received over 1,500 emails related to Ms. Huge's case, with a great number of those emails coming directly from Ms. Huge. *Id.*

42. Boeing prepared for Ms. Huge's job coaches by finalizing the ENSO contract and obtaining security badges for the job coaches. *See, e.g.*, Ex. A-380 at 94-95. Ms. Huge's managers were out of the office in December prior to Boeing's winter shutdown (December 22, 2012 to January 1, 2013), Ex. A-380 at 98, but Boeing allowed Ms. Huge to return to work for one day on December 21, 2012, so she would qualify for

benefits and receive pay during the Boeing shutdown over the holidays, and then the plan was for her to return to work with her job coaches on January 2, 2013.  Ex. A-380 at 94.

43. On January 2, 2013, Ms. Huge returned to work at Boeing after the winter shutdown. However, instead of performing work, Ms. Huge spent much of her time e-mailing and calling SPEEA to complain.   In response, Ms. Huge's Union representative, Rich Plunkett, told Ms. Huge that she needed to spend her work time accomplishing her work-related tasks and not to focus on making complaints to her Union. Exs. A-159, A-352 at 3.

44. On January 3, 2013, Ms. Huge was permitted to clean out her email inbox and given the assignment to simply finish unpacking her boxes but she did not complete that task.  Ex. A-352 at 3.  That same day, Ms. Huge asked her Union representative, Charles Tatel whether she had a right under her Union contract to contact/call SPEEA (her Union) during business hours to report workplace concerns.  Ex. A-159.  Ms. Huge's Union contract did not give Ms. Huge the right to contact the Union during working hours in lieu of doing her assigned work tasks.  Dkt. 78 at 164:10-165:23; Ex. A-407.  Mr. Tatel told Ms. Huge via email that she did not have a right under the Union contract to contact or call the Union during working time.  Dkt. #78 at 164:10-165:23; Ex. A-407. Despite this clear instruction from her own Union representative, Ms. Huge continued to contact her Union during work hours to complain about Boeing management.  Dkt. #79 at 198:9-13, 204:18-205:13.

45. ENSO delayed starting the job coaches until January 7, 2013, due to payment issues. Ex. A-46 at 1.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 22

46. With Ms. Huge's job coaches present, Boeing provided Ms. Huge with a Notice of Remedial Action ("NORA") on January 7, 2013, expressly documenting Boeing's expectations for Ms. Huge's work performance which Boeing had planned to implement prior to her going on leave. Ex. A-28. During the meeting regarding the NORA, Ms. Huge stated that the coaches were there as her "witnesses" and that "everyone will be subpoenaed in her lawsuit." Ex. A-352 at 20. Ms. Huge also interrupted others and ignored her job coach's suggestion to respect others and to listen to what was being said. *Id.*

47. During this time, Ms. Huge continued to not focus on completing her assigned work tasks, and instead conducted personal business and side tasks during the majority of the workday and ignored directions from her managers and team leader. Exs. A-94, A-213, A-352; Dkt. #79 at 196:21-204:8. Rather than complete her assignments, Ms. Huge "discovered a broken post-it pad…[and] spent considerable time sending emails to management & HR to be compensated," "continued to request attendance of conferences...[and] searched the CAS OE server for evidence to support her request," and was unable to complete assignments due to meetings with SPEEA and HR. Ex. A-94.

48. Plaintiff's new manager Dan McQueen gave Ms. Huge much more time then he would give to other engineers, yet Ms. Huge still did not complete the assignments he gave her. He observed that instead of doing work, "[a] lot of the day was spent on the phone, emails, researching things that weren't pertinent to the job that were more associated with who is attending conferences and different aspects like that. 'Why can't I get business cards?' [Ms. Huge] wasn't focused. Contacting the union a bit much during

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 23

work hours, and not focusing on the tasks that were assigned at the time, and a good portion of the time was that." Dkt. #78 at 64:23-65-6.

49. According to the observations of the job coach Jamie Eang, Ms. Huge would not focus on her job or do her work at this time, instead attempting to discuss "the discrimination, or emailing, you know, SPEEA and her representatives." Dkt. #78 at 106:1-16. Instead of working with the job coaches, Ms. Huge seemed fixated on building a lawsuit against Boeing and did not exhibit to her job coaches a desire to improve her performance. *Id*. at 103:17-105:6, 144:6-8. Ms. Huge requested that the job coaches act as eyes and ears for her and assist with gathering evidence for a lawsuit. *Id*.; *see generally* Ex. A-112. Jamie Eang testified, "she had her idea of myself as a job coach as someone to support her in a legal testimony versus actually helping her keep her job." Dkt. #78 at 103:17-104:2. Ms. Huge made it clear that she saw Ms. Eang as "another set of eyes; to help [her], you know, sue Boeing; to, you know, really make a case." *Id*. at 103:17-22. Ms. Huge's job coaches, who had extensive experience with individuals on the autism spectrum, gave Ms. Huge's supervisors guidance on how to better work with Ms. Huge and they were receptive to the feedback. Dkt. #78 at 102:21-103:13. The job coaches worked to help Ms. Huge complete her job tasks and succeed at Boeing, but Ms. Huge continued to not perform work. Dkt. #78 at 83:25-86:6, 140:16-142:13; Ex. A-404.

50. Because Ms. Huge was not performing her job, the job coaches decided that Ms. Huge needed rules that would help her succeed in the workplace. Dkt. #78 at 109:13-111:5. They prepared a written behavior expectation plan to address their expectations of Ms. Huge in their work with her. *Id*. Ms. Huge verbally agreed with the behavior expectations in a meeting with the job coaches. *Id*.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 24

51. After one week, Ms. Huge fired her job coaches.  Dkt. #78 at 82:12-83:10, 112:14-113:7, 142:14-18; Exs. 139, 191.  Although Ms. Huge later indicated that she fired them because she wanted her counselor Ms. Bloom as her job coach, Ms. Huge was fully aware that the latest information from Ms. Bloom was that she was not willing to work as her job coach.  Ex. 146.

52. On January 21, 2013, Boeing discharged Ms. Huge for failing to meet the performance expectations in her NORA, after Boeing determined that Ms. Huge's performance continued to be unacceptable and that she showed no willingness to improve.  Dkt. #79 at 178:10-179:21; Ex. 135.

53. Although Ms. Huge knew she was discharged for cause, she misrepresented on her application to Northrop Grumman that she was laid off from Boeing in 2013.  Ex. A-326. Dkt. #77 at 58:21-23, 59:23-60:17.

54. Ms. Huge also reapplied for employment with Boeing under different names, including "Katie McMillin," "Katie Huge," Joan and Kathleen, and using different addresses, including a California address, without disclosing her discharge. Dkt. #79 at 158:9-159:18.

## V.      CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and this dispute.

2. Plaintiff's claims arise under the Americans with Disabilities ("ADA") and the Washington Law against Discrimination ("WLAD"), RCW 49.60 *et seq*.  Plaintiff argues that Boeing intentionally discriminated against her on the basis of her disability or failed to provide her a reasonable accommodation in violation of the ADA or WLAD by placing her on unpaid medical leave in June 2012, or withdrawing the job offer for

the Long Beach position, or terminating her employment in January 2013; and that Boeing intentionally retaliated against her by placing her on unpaid medical leave in June 2012 or by terminating her employment in January 2013.  Dkt. #68 at 9-10.

3.  The ADA states "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

4.  The WLAD prohibits discrimination by an employer against an employee because of "the presence of any sensory, mental, or physical disability." RCW 49.60.180(3).

5.  "The essence of the concept of reasonable accommodation is that, in certain instances, employers must make special adjustments to their policies for individuals with disabilities." *McAlindin v. County of San Diego*, 192 F.3d 1226, 1237 (9th Cir. 1999). "The ADA places a duty to accommodate on employers in order to remove barriers that could impede the ability of qualified individuals with disabilities to perform their jobs.... this is a continuing duty that is not exhausted by one effort." *Id.* (internal quotation marks and citations removed).

6.  "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001). "An appropriate reasonable accommodation must be effective, in enabling the employee to perform the duties of the position." *Id*. The interactive process requires "communication and good-faith exploration of possible accommodations" between

employer and employee, and neither side can delay or obstruct the process.  *Id.*; *see also*

*Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114-15 (9th Cir. 2000) (en banc) (citing *Beck*

*v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("A party that

obstructs or delays the interactive process is not acting in good faith.  A party that fails

to communicate, by way of initiation or response, may also be acting in bad faith.")),

*vacated on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S. Ct. 1516,

152 L. Ed. 2d 589 (2002); *Beck*, *supra* ("[N]either party should be able to cause a

breakdown in the process for the purpose of either avoiding or inflicting liability.").

7. Plaintiff has elected to proceed by claiming "direct evidence" discrimination.[1]  *See* Dkt.

#53 at 8-9.   Direct evidence "is evidence which, if believed, proves the fact [of

discriminatory animus] without inference or presumption."  *Aragon v. Republic Silver*

*State Disposal*, 292 F.3d 654, 662 (9th Cir. 2002) (citing *Godwin v. Hunt Wesson, Inc.*,

150 F.3d 1217, 1221 (9th Cir. 1998)) (bracketed text in original).   Explicit racist or

sexist statements, for example, can constitute such "direct evidence" of discrimination.

*Id.* (citing *Godwin*, 150 F.3d at 1221 (decision-maker who denied plaintiff a position

said that he "did not want to deal with another female;" at meeting, a male co-worker

gave woman who was presenting a "Barbie Doll Kit" containing two dildos and a bottle

---

[1] Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), a plaintiff alleging disparate treatment must first establish a *prima facie* case of discrimination.  Specifically, the plaintiff must show that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably.  *Id.; Chuang v. University of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000).  Ms. Huge asserts that she is claiming "direct evidence" discrimination.  Dkt. #48 at 5.  "A plaintiff may alternatively proceed by simply producing direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer."  *Surrell v. Cal. Water Serv.*, 518 F.3d 1097, 1105 (9th Cir. 2008) (internal quotation marks omitted).  Ms. Huge asserts that she need only prove three elements: "(1) the plaintiff is disabled within the meaning of the ADA; (2) the plaintiff is a qualified individual able to perform the essential functions of the job, with or without reasonable accommodations; and (3) the plaintiff suffered an adverse employment action because of her disability."  Dkt. #28 at 16, citing *Allen v. Pacific Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003) (citing *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999)).  The Court has already determined as a matter of law that Ms. Huge is disabled under the ADA and WLAD by virtue of her diagnoses of Asberger's and autism.  Dkt. #53 at 9.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 27

of Wesson oil); *Cordova v. State Farm Ins.*, 124 F.3d 1145, 1149 (9th Cir. 1997) (employer referred to a Mexican-American employee as a "dumb Mexican"); *Lindahl v. Air France*, 930 F.2d 1434, 1439 (9th Cir. 1991) (employer stated that female candidates get "nervous" and "easily upset"); *Sischo-Nownejad v. Merced Cmty. College Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991) (employer referred to plaintiff as an "old warhorse" and to her students as "little old ladies")).

8.   The preponderance of the admissible evidence at trial fails to establish a violation of the WLAD or the ADA for the reasons discussed below.

**A. Failure to Accommodate**

9.   The evidence did not establish that Boeing failed to affirmatively adopt reasonable measures that were available to Boeing and necessary to accommodate any disability of Ms. Huge.  The preponderance of the evidence showed that Boeing spent great time and effort to engage in the interactive process with Ms. Huge in good faith after she requested accommodations.

10.  Boeing attempted in good faith to provide Ms. Huge with reasonable accommodations by providing her with written instructions, unpaid leave, and job coaches.  These accommodations were not attempted in a cursory or callous fashion; they were put forth in several permutations after lengthy consultations between medical, HR, and legal representatives of Boeing and Ms. Huge.

11.  Most critically, the record shows that Ms. Huge repeatedly failed to engage in the interactive process in good faith.  From Boeing's perspective, Ms. Huge's requests for accommodation were contradictory, at first requesting no accommodation, then requesting several different accommodations, then requesting that only one be tried at a

time.  Ms. Huge repeatedly delayed or obstructed the process, even after obtaining legal counsel.  Throughout the interactive process, Ms. Huge was implicitly and even explicitly focused on building a lawsuit against Boeing, and this contributed to the repeated breakdowns in the interactive process.  As a matter of law, this does not constitute good faith.  Finally, Ms. Huge failed to engage in the interactive process in good faith when she effectively terminated the job coaching services she was receiving from ENSO.

12. Ms. Huge's failure to engage in the interactive process in good faith removed Boeing's obligation to provide a reasonable accommodation and thus the Court need not determine if Ms. Huge met her burden of establishing that she could perform the essential functions of her job with or without reasonable accommodation.  Even if she could, her claim fails.

13. The Court finds in favor of Boeing on this claim.

**B. Intentional Discrimination Claim**

14. Ms. Huge has failed to demonstrate direct evidence that Boeing intentionally discriminated against her by placing her on unpaid medical leave in June 2012, withdrawing the Long Beach, CA job offer, or terminating her employment in January 2013.

15. Boeing had legitimate, non-discriminatory reasons for placing Ms. Huge on unpaid medical leave in June 2012.  This leave was part of Boeing's search for a reasonable accommodation for Ms. Huge's disability.  Boeing's actions can be explained by Ms. Huge's conflicting requests for accommodation and her failure to engage in the interactive process in good faith.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 29

16. Boeing had legitimate, non-discriminatory reasons for withdrawing the Long Beach, CA job offer.  Long Beach Manager Dung Tran credibly testified that he had no knowledge of Ms. Huge's disability or that she was on medical leave, and that he did not believe he could wait for Ms. Huge to become available to fill the position in his organization, for which there was a pressing need.

17. Boeing had legitimate, non-discriminatory reasons for terminating Ms. Huge's employment and any other adverse employment action taken with respect to Ms. Huge. These reasons included Ms. Huge's repeated unwillingness to perform the tasks required for her position.

18. There is insufficient evidence to find that Boeing's stated reasons for terminating Ms. Huge's employment, her failure to meet performance expectations for the IE 3 position and her failure to demonstrate willingness to improve her performance, were pretext for disability discrimination.

**C. Retaliation**

19. There is insufficient evidence to find that any statutorily protected activity that Ms. Huge engaged in was a substantial motivating factor in any adverse employment action by Boeing.

20. The preponderance of the evidence showed that Boeing's decision to place Ms. Huge on leave was not retaliatory, it was part of the oft-derailed interactive process.

21. The preponderance of the evidence showed that Boeing's decision to terminate Ms. Huge's employment for failure to meet performance expectations for her position and failure to demonstrate willingness to improve her performance was not retaliatory.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 30

22. There is insufficient evidence to find that Long Beach manager Dung Tran had knowledge of any protected activity that Ms. Huge engaged in or that his decision to rescind Ms. Huge's Long Beach job offer was significantly motivated by any protected activity that Ms. Huge engaged in.

## VI. ORDER

Having fully considered the evidence presented at trial, the exhibits admitted into evidence, and the argument of counsel, and being fully advised, the Court finds in favor of Defendant. This matter is now CLOSED.

DATED this 4th day of March 2016.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 31